**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2023 IL App (3d) 230326-U

Order filed November 13, 2023

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2023

| | | |
|---|---|---|
| *In re* K.B., | ) | Appeal from the Circuit Court |
| | ) | of the 21st Judicial Circuit, |
| a Minor | ) | Kankakee County, Illinois, |
| | ) | |
| (The People of the State of Illinois, | ) | |
| | ) | |
| Petitioner-Appellee, | ) | Appeal No. 3-23-0326 |
| | ) | Circuit No. 18-JA-30 |
| v. | ) | |
| | ) | |
| Cortez B., | ) | Honorable |
| | ) | JoAnn Imani Drew, |
| Respondent-Appellant). | ) | Judge, Presiding. |

_____

PRESIDING JUSTICE HOLDRIDGE delivered the judgment of the court.
Justices Peterson and Davenport concurred in the judgment.

_____

**ORDER**

¶ 1     *Held*:  The circuit court did not err when it determined that (1) the respondent was unfit to parent K.B. and (2) K.B.'s best interest favored terminating the respondent's parental rights.

¶ 2     The circuit court found the respondent, Cortez B., unfit to parent his child, K.B. (born July 2007). Following a best interest hearing, the court entered an order terminating the respondent's parental rights. The respondent appeals.

¶ 3                                   I. FACTS

¶ 4          In September 2018, the State filed a petition alleging 11-year-old K.B was neglected because her environment was injurious to her welfare. The petition stated K.B.'s younger brother was born prematurely with a controlled substance in his system and K.B. had been left alone at the hospital. Both of K.B.'s parents were named as respondents, however, only her father, the respondent, is a party to this appeal. At the shelter care hearing, the court found that probable cause for the petition existed and there was an immediate and urgent necessity to remove K.B. from the home. The court awarded temporary custody to the Department of Children and Family Services.

¶ 5          In November 2018, the court entered an adjudicatory order, wherein it found that K.B. was abused or neglected in that she was in an environment injurious to her welfare (705 ILCS 405/2-3(1)(b) (West 2018)). A report filed by the Lutheran Child and Family Services (LCFS) noted that K.B.'s mother, prior to her discharge from the hospital after giving birth to K.B.'s brother, left the hospital to obtain drugs and left K.B. unattended for several hours without arranging for proper care or money for food. Regarding the respondent, an April 2018 investigation commenced when K.B. reported she witnessed domestic violence between her father and his paramour, and she was afraid to return to his care. The respondent was incarcerated, and K.B. went to live with her mother. The respondent was referred for random drug drops and an individual assessment. Visitation was recommended to be supervised one hour per week.

¶ 6          In December 2018, the court entered a dispositional order wherein it found the respondent unable and unwilling due to the indicated finding of neglect from 2018 where K.B. witnessed domestic violence. Further, the respondent needed to participate in the individual assessment and complete services. The court adjudicated K.B. as neglected, made her a ward of the court, and set a permanency goal of return home within 12 months.

2

¶ 7 Various reports and testimony throughout this case provided the following facts. The respondent attended two visits with K.B. facilitated by a caseworker in November and December 2018. The respondent completed one drug drop that was positive for cannabis. He failed to participate in services (which were recommended based on his history) despite the caseworker's repeated contact. In June 2019, the respondent was incarcerated for domestic battery. In 2019 and 2020, the court entered three permanency orders finding the respondent did not make reasonable progress or efforts with his service plan.

¶ 8 In April and May 2021, while incarcerated, the respondent called the caseworker and asked about visits with K.B. The caseworker approached K.B. with the request, and K.B. stated that she was not sure she wanted that yet. K.B. had mental health struggles. At that time, in-person visits were not allowed per COVID-19 restrictions, but phone visits were allowed. K.B. was "sort of" open to phone visits, but the caseworker was never able to confirm if K.B. was on the call list and who would be supervising the contact. The respondent did not have phone contact with K.B. and only saw her in court. At court appearances, he would ask about K.B. and to see her. However, while incarcerated, he never attempted to send K.B. letters or cards for special occasions. At a permanency review hearing in September 2021, the court found that the respondent made reasonable efforts but not progress.

¶ 9 The respondent was released from jail on November 3, 2021. His first contact with the caseworker after his release was on November 17, 2021, at a court appearance. The caseworker spoke with him and provided him with her contact card. She informed the respondent that he needed to provide drug drops, enroll in a domestic violence program, and sign consents. The respondent followed up with the caseworker two days later and scheduled an appointment for December 1, 2021, to complete the integrated assessment, start services, and talk about visitation

(K.B. told the caseworker she was ready to start phone calls with the respondent). The respondent failed to attend the December 1, 2021, appointment. On December 10, 2021, the respondent informed the caseworker that he missed the appointment because he had to work and his phone had been shut off. The appointment was rescheduled for December 13, 2021, and the respondent again failed to attend. After repeated failed contact, in February 2022, the caseworker discovered the respondent's phone was disconnected. The caseworker sent the respondent a letter by mail. The caseworker then had contact with the respondent at a permanency review hearing in April 2022, where the court found the respondent failed to make reasonable efforts or progress.

¶ 10       A new caseworker was assigned in April 2022 and a new service plan was implemented, which identified the services he needed to participate in and complete. The respondent did not comply with the service plan except for the item requiring he refrain from any incidents of domestic battery. The respondent would ask about K.B. while at court, however, he never followed up with regards to her welfare or to schedule visitation. In August 2022, K.B. began conversations with the respondent and then decided she no longer wanted to continue to speak with him. Since K.B. refused visits and contact, no visits were arranged. Following a clinical review meeting, it was decided that K.B. would not be forced to visit with the respondent.

¶ 11       In April 2022, the State filed a motion to terminate the respondent's parental rights on two bases: (1) he failed to maintain a reasonable degree of interest, concern, or responsibility as to K.B.'s welfare; and (2) he failed to make reasonable progress toward K.B.'s return to his home during the nine-month period of June 30, 2021, to March 31, 2022. Following a hearing, the court found the respondent unfit. The matter proceeded to a best interest hearing where the evidence showed K.B. was a sophomore in high school and was on her seventh foster placement. Her past placements showed unacceptable behavior and mental health struggles. K.B.'s current foster

4

family stated they were committed to K.B. The foster mother was K.B.'s former middle school teacher, and K.B. referred to her foster parents as "mom" and "dad." K.B. had been with this placement for four months and was happy.

¶ 12     The foster family stated K.B. had no behavioral issues and they were committed to K.B. for permanency. K.B. began opening up to the family about her past trauma, needs, and desire to stay in the home. K.B. received high grades and was thinking about college and her future. She also bonded with the foster family, friends at school, and played basketball. The caseworker provided the respondent had still not completed the integrated assessment or services. The guardian *ad litem* opined it was in K.B.'s best interest to terminate the respondent's parental rights so that K.B. could have some permanency. The court found it was in K.B.'s best interest to terminate the respondent's parental rights on both grounds. The respondent appeals.

¶ 13                                   II. ANALYSIS

¶ 14     On appeal, the respondent argues that the circuit court's finding that he was unfit and decision to terminate his parental rights were against the manifest weight of the evidence.

¶ 15     The involuntary termination of parental rights is a two-step process. First, the State must prove by clear and convincing evidence that the parent is "unfit" as defined in section 1(D) of the Adoption Act. *In re Tiffany M.*, 353 Ill. App. 3d 883, 889 (2004). If the court finds the parent "unfit" within the meaning of section 1(D) of the Adoption Act, it must then determine whether the child's best interest favors terminating parental rights. *In re J.L.*, 236 Ill. 2d 329, 337-38 (2010).

¶ 16                                   A. Fitness

¶ 17     A circuit court's fitness determination will only be reversed if its findings of fact were against the manifest weight of the evidence. *In re C.N.*, 196 Ill. 2d 181, 208 (2001). A finding is against the manifest weight of the evidence when an opposite conclusion is clearly evident. *In re*

*A.W.*, 231 Ill. 2d 92, 102 (2008). We will not overturn a court's findings merely because we would have reached a different result. *In re K.B.*, 2012 IL App (3d) 110655, ¶ 23.

¶ 18    In this case, the court found that the respondent was unfit on two grounds: (1) he failed to maintain a reasonable degree of interest, concern, or responsibility as to K.B.'s welfare (750 ILCS 50/1(D)(b) (West 2022)); and (2) he failed to make reasonable progress toward K.B.'s return to his home during the nine-month period of June 30, 2021, to March 31, 2022 (750 ILCS 50/1(D)(m)(ii) (West 2022)). However, the respondent *only* challenges the latter ground on the sole basis that he was just released from prison and the time period was not sufficient for him to engage in or complete services. The State was only required to prove one statutory ground for unfitness. *In re Tr. A.*, 2020 IL App (2d) 200225, ¶ 43. So, even if the court's finding of unfitness was erroneous as to the nine-month period, it is without a difference as the court's other basis for finding the respondent unfit still stands unchallenged.

¶ 19    Moreover, the respondent fails to cite any authority for his argument that his incarceration for around four months during the nine-month period somehow excuses his lack of progress. *In re A.M.*, 358 Ill. App. 3d 247, 251 (2005) ("Bare contentions advanced without citation to relevant authority do not merit consideration on appeal."). Accordingly, the court's finding of unfitness was not against the manifest weight of the evidence.

¶ 20                          B. Best Interest

¶ 21    Once the court finds the parents unfit, all further considerations must yield to the child's best interest. *In re D.M*, 298 Ill. App. 3d 574, 581 (1998). Here, the court determined that K.B.'s best interest favored terminating the respondent's parental rights. A reviewing court reviews a best interest determination under the manifest weight of the evidence standard. *In re J.B.*, 2019 IL App (4th) 190537, ¶ 33. In making a best interest determination, the court must consider the following

6

factors in the context of the child's age and developmental needs: the child's physical safety and welfare; development of the child's identity; the child's background; the child's attachments; the child's wishes and long-term goals; the child's community ties; the child's needs for permanence; the uniqueness of every family and child; the risks inherent to substitute care; and the preferences of the people available to care for the child. 705 ILCS 405/1-3(4.05) (West 2022).

¶ 22 The respondent's only argument on this issue is that there remains a bond between him and K.B. Again, he has failed to cite any authority suggesting that a bond can outweigh every other consideration or point to any evidence suggesting that such a bond exists. Regardless, our review of the record demonstrates that it was in K.B.'s best interest to terminate the respondent's parental rights based on many factors, including, but not limited to: (1) K.B.'s physical safety and welfare were being met by her foster family; (2) K.B. has opened up to her foster family about past trauma and her needs; (3) K.B. began advocating for herself and looking at her future; (4) K.B.'s background and ties with the respondent were not positive compared to her relationship with her foster mother with whom she had a positive relationship; (5) K.B. displayed a sense of attachment with her foster family by referring to her foster parents as "mom" and "dad"; (6) K.B. was happy in the home and did not want to move; (7) K.B.'s foster parents were committed to K.B. with the goal of adoption; (8) K.B. made friends at school, where she earned high grades, and played basketball; and (9) K.B.'s foster family met her need for stability.

¶ 23 Thus, the court's decision to terminate the respondent's parental rights was not against the manifest weight of the evidence.

¶ 24 III. CONCLUSION

¶ 25 The judgment of the circuit court of Kankakee County is affirmed.

¶ 26 Affirmed.